

**NUMBERS**

**13-13-00379-CR**

**13-13-00380-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**TRACI SHEPPARD SCHROEDER**
**A/K/A TRACI LEE SCHROEDER,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                    **Appellee.**

---

**On appeal from the Criminal District Court No. 3**
**of Dallas County, Texas.**

---

# MEMORANDUM OPINION

**Before Justice Garza, Benavides and Perkes**
**Memorandum Opinion by Justice Garza**

A Dallas County jury convicted appellant, Traci Sheppard Schroeder a/k/a Traci Lee Schroeder, of one count of fraudulent use or possession of identifying information,[1] *see* TEX. PENAL CODE ANN. § 32.51(b) (West, Westlaw through 2013 3d C.S.), and one count of possession of methamphetamine.[2] *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.115(a) (West, Westlaw through 2013 3d C.S.). After finding two enhancement paragraphs true, the jury sentenced Schroeder to prison terms of nine and one-half years and four years for the respective offenses, and the sentences were ordered to run concurrently.

Schroeder raises twelve issues on appeal. She contends that: (1) the evidence was insufficient to show that she fraudulently used or possessed identifying information; (2) the trial court erred by refusing her request to include a definition of "harm" in the jury charge; (3) the trial court erred by admitting evidence obtained from underneath a mobile phone battery; (4) the trial court erred by requiring her to wear shackles during trial; (5) the trial court erred by admitting prior judgments of conviction in the fraudulent identification case; (6) the trial court erred by admitting prior judgments of conviction in the methamphetamine possession case; (7) there was insufficient evidence to support enhancement paragraphs in the fraudulent identification case; and (8) there was insufficient evidence to support enhancement paragraphs in the methamphetamine possession case. Schroeder further raises four issues seeking to correct clerical errors in the judgments.

Because the enhancement paragraphs were supported by insufficient evidence,

---

[1] Appellate cause number 13-13-00379-CR.

[2] Appellate cause number 13-13-00380-CR.

2

we will reverse the punishments assessed, affirm the remainder of the judgments as modified, and remand for further proceedings.[3]

## I. BACKGROUND

Indictments filed on September 20, 2012 alleged that Schroeder: (1) "with intent to harm and defraud another, and without the effective consent of" the complainant Elizabeth McCullough, "use[d] identifying information of said complainant, to-wit: NAME, ADDRESS AND DATE OF BIRTH"; and (2) intentionally and knowingly possessed less than one gram of methamphetamine.[4] The fraudulent identification indictment also alleged that Schroeder had been previously convicted of felony criminal mischief in 1990 and felony credit card abuse in 1994. The State later filed notice of intent to use those prior convictions in the methamphetamine possession case as well.

At trial, Officer Eric LaCross of the Irving Police Department testified that, at around 9:00 p.m. on September 10, 2012, he attempted to pull over a vehicle that was being operated without headlights. When the vehicle stopped at a red light, "the front passenger got out of the vehicle and contacted" the officer. LaCross testified that the passenger told him "something had caught fire in the car, so they didn't have headlights, and they had called dispatch and somebody in dispatch had told them to drive on the highway without lights." He instructed the driver to pull into an adjacent parking lot when the light turned green. The driver did so and identified himself as Michael Avina. LaCross asked Avina for his driver's license and explained to him that he cannot drive at night without

---

[3] This appeal was transferred from the Fifth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

[4] The fraudulent identification indictment and judgment of conviction refer to the defendant therein as "TRACI SHEPPARD SCHROEDER." The methamphetamine possession indictment and judgment of conviction refer to the defendant therein as "TRACI LEE SCHROEDER."

3

headlights. LaCross then asked the passenger for her name, and she replied that her name is Elizabeth McCullough. The passenger further stated that her date of birth is January 16, 1963 and she works at Brighton-Best, a distributor of industrial products. She also gave her address and phone number. She was not able to produce a driver's license.

LaCross went back to his patrol unit and checked for outstanding warrants using the names and information provided by Avina and the passenger.[5] The search revealed that Avina and McCullough both had previous arrests. Afterward, he let the driver and passenger go without ticketing them or arresting them.[6] However, he stated that the passenger's behavior was suspicious, in part because she "told [him] several different date[s] of birth[] at first" and "didn't have any kind of ID."

According to LaCross, his colleague Detective James McLelland later informed him that he "had obtained a warrant related to someone giving out Elizabeth McCullough's identifying information." McLelland told LaCross that Schroeder was the person using that information. LaCross identified Schroeder in the courtroom.

On September 13, 2012, LaCross went with another officer to the address provided by Avina in order to execute the warrant and arrest Schroeder. However, there was a lock-out device attached to the knob of the apartment's front door. A security guard at the apartment complex described Avina's vehicle, and LaCross waited for Avina to return. After about an hour, he saw a vehicle that matched the description. LaCross followed the vehicle and stopped it when "[t]he driver failed to use his turn signal when he turned into

---

[5] He also "sent an image to dispatch . . . asking if anybody had told somebody that called in to drive on the highway without their lights on." As the officer expected, "nobody responded that they told them that it was okay to drive down the highway without headlights."

[6] LaCross initially agreed on cross-examination that Avina and his passenger "w[ere] not being detained" at that time. However, he later stated during re-direct examination that they were being lawfully detained pursuant to a lawful traffic stop, and that they were not free to leave.

4

the apartments." Avina was driving. LaCross first made contact with Avina and then made contact with Schroeder, the passenger. He arrested Schroeder pursuant to the warrant that had been issued.

LaCross testified that Schroeder "carried [a purse] with her out of the car when she first stepped out," and he "asked her to put it back in the seat so [he] could handcuff her safely." He then handcuffed Schroeder and placed her in the back of his patrol unit. He then went back to Avina and asked for consent to search Avina's car. Avina granted consent to search the car, but LaCross did not find anything of interest. LaCross did not search the purse at that time because "[Avina] could not give consent for me to search her stuff." At some point, Schroeder asked Avina if Avina would take her purse. LaCross did not allow Avina to take the purse, however, because "[i]t's possible that . . . she had other identifying information in her purse or something related to that offense." Schroeder then asked LaCross if she could give Avina her car keys; LaCross reached into the purse, took the car keys, and gave them to Avina. LaCross stated that no one else had access to the purse from the time he pulled the car over to the time he "took the car and put in the purse to take with [him] to the jail."

LaCross testified that, after he brought Schroeder to the Irving City Jail, he searched her purse incident to the arrest. When asked why he searched the purse at the jail instead of at the scene, LaCross testified: "I would rather search it in a well-lit area that has a table that I can set things down on as opposed to inside of a vehicle or on the hood of a squad car." He stated:

> I looked for further evidence of the crime, the—especially identifying information. She had two cellphones in her purse, which I thought was a little bit strange. One didn't have a back or battery in it, and the other one had a battery and a back. I took off the back of the cellphone, and behind

5

the battery was a small piece of paper with a small amount of methamphetamines in it.[7]

LaCross stated that he searched under the battery because "anything that goes into the jail, I'm liable for.  So if there's, I don't know, a razor blade or some other drugs or something, anything that gets into the jail, it's on me that it got to that."  He said it was not uncommon to "find drugs hidden in this manner."

On cross-examination, LaCross could not recall whether Schroeder had in fact "never changed that birth date that she gave [him]" initially.  He conceded that he did not personally check whether Schroeder lived at the address she provided to him on September 10.  He denied knowing that Avina had been arrested at his apartment between September 10 and September 13.  LaCross stated that his intention on September 13 was to stop Avina's car to see if Schroeder was inside; however, he denied that he was "going to stop the vehicle no matter what," even if there was no traffic infraction.  He conceded that Avina was alone in his car with Schroeder's purse for about two minutes, but that "I believe my backup officer was there as well, and he had an eye on him."  He later conceded that he is not certain that the other officer was observing Avina during that time.  LaCross stated that he does not have any evidence that Schroeder knew that the drugs were inside the cell phone.

LaCross testified that both the September 10 and September 13 interactions were captured on his patrol unit's video recording system.  The video recordings were played for the jury.

McLelland testified that he "began receiving a series of phone calls" in August or

---

[7] LaCross later testified, when asked whether he recalled the weight of the drugs that he seized: "That's a usable amount, so it would be 0.1 grams."

September 2012 from Tonya Strickland, who "identified herself as a relative of a warrant officer of ours who was calling on behalf of a friend." McLelland agreed that, based on the calls, his "attention [was] drawn to a potential traffic stop involving either Elizabeth McCullough or [Schroeder]." He searched for Schroeder's name in his computer system and "found out that [he] had been assigned a case involving a traffic stop that occurred earlier that morning." According to McLelland, "the report was . . . written up with allegations of identity theft for things that happened during the stop." The case was assigned to him because he handles fraud and financial crimes. McLelland reviewed the September 10 video from LaCross's patrol unit and compared driver's license images of McCullough and Schroeder to the female that appeared in the video. McLelland stated that the female in the video, despite identifying herself as McCullough, is "clearly" Schroeder.

McLelland made contact with the actual Elizabeth McCullough. Based on his conversation with her, he believed that Schroeder had committed the offense of fraudulent use or possession of identifying information, and he obtained a warrant for Schroeder's arrest. He informed LaCross that he had obtained a warrant.

Later, McLelland sought to interview Schroeder in jail. After being administered *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436 (1966), Schroeder agreed to speak with him. According to McLelland, Schroeder stated that she used to live with McCullough, and she admitted that she provided McCullough's name and date of birth to LaCross during the September 10 traffic stop. Schroeder stated that McCullough had given her consent to use McCullough's identifying information in order to register a car. McLelland did not ask Schroeder whether McCullough gave her permission to give

7

McCullough's identifying information to police if she were in a traffic stop.

On cross-examination, McLelland stated that McCullough initially did not want to file a complaint because "she was concerned for her safety about doing so." He later clarified that McCullough was afraid of Schroeder. He agreed that, according to his police report, McCullough had an appointment to meet with him at the police station the next day, but she did not appear or call to cancel. McLelland denied that "there is no intent to harm or defraud anybody in this case"; he explained that Schroeder's "intentions to harm or defraud were directed toward Officer LaCross at the time of his stop." When defense counsel asked how McCullough had been harmed or defrauded in this case, McLelland replied: "Her name was listed in the police report when it should not have been because of Ms. Schroeder's identifying herself in that capacity."

McCullough testified that her date of birth is January 16, 1963 and that she works at Brighton-Best. She stated that she lives at the exact address given by Schroeder during the September 10 traffic stop. She has known Schroeder for thirty-five years, and she was in an "[o]ff and on" relationship with Schroeder from 2007 to 2012. When Schroeder's car became impounded in March 2012, McCullough agreed to help Schroeder by obtaining insurance for her using McCullough's information, so that Schroeder's car would be released from impound. McCullough denied ever giving permission to Schroeder to use her information to register any car. She agreed that Tonya Strickland, her friend "who had a brother who is a police officer," called Irving police to ask "what I could do to get the car out of my name."

In August 2012, McCullough's driver's license went missing. The next month, she was contacted by police asking if she was part of a routine traffic stop on September 10.

8

She replied that she was not. McCullough stated that, initially, she was hesitant to participate in the investigation "[b]ecause we've been good friends for so long. I didn't want to bring any harm her way, but I had to protect myself." When asked whether she was afraid of Schroeder, McCullough replied: "If she's capable of doing that, I didn't know what else she would be capable of doing." McCullough denied ever giving Schroeder her driver's license, or ever giving Schroeder permission to use her name, date of birth, or address for any purpose. She said it is "[p]robably safe to say" that she and Schroeder are no longer friends.

Schroeder was convicted as charged. At the punishment phase, the trial court admitted into evidence, over defense counsel's objections, two judgments reflecting prior convictions. No witnesses testified at the punishment phase. The jury found the two enhancement paragraphs true and sentenced Schroeder as set forth above. This appeal followed.[8]

## II. DISCUSSION

### A. Evidentiary Sufficiency

We first address Schroeder's evidentiary sufficiency issues. *See, e.g., Lucas v. State*, 245 S.W.3d 611, 612 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (noting that issues calling for rendition of judgment are considered before issues calling for remand).

In reviewing the sufficiency of evidence supporting a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

---

[8] The State submitted its appellate brief to this Court on July 22, 2014, some 29 days after it was due pursuant to an extension of time previously granted by this Court on May 23, 2014. *See* TEX. R. APP. P. 38.6. The State also moved for a second extension of time to file the brief. We hereby grant the motion and accept the brief.

*Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). When faced with conflicting evidence, we presume that the trier of fact resolved any such conflict in favor of the prosecution, and we defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* This principle applies to necessary elements of the offense as well as to findings necessary to support enhanced punishment. *Young v. State*, 14 S.W.3d 748, 750 (Tex. Crim. App. 2000).

### 1.  Fraudulent Use of Identifying Information

By her first issue, Schroeder argues that there was insufficient evidence to support the jury's finding that she fraudulently possessed or used identifying information. A hypothetically correct jury charge would state that Schroeder is guilty of the offense as charged in the indictment if she: (1) with intent to harm and defraud another, (2) used the name, date of birth and address of Elizabeth McCullough, (3) without McCullough's

effective consent. *See* TEX. PENAL CODE ANN. § 32.51(b); *see id.* § 32.51(a)(1)(A) (defining "identifying information" as including a person's name and date of birth).

Schroeder argues specifically that the State failed to prove beyond a reasonable doubt that she "intended to harm or defraud a person as charged in the indictment." *See id.* § 32.51(b). She argues that "[t]he State's theory of the case centered on its position that [she] harmed or defrauded Officer LaCross" but that "the State offered no specific evidence regarding what harm or fraud [she] intended by giving McCullough's name to LaCross during the routine traffic stop." She further argues that there was no evidence that she intended to harm or defraud McCullough, noting that, in response to being asked whether she thought Schroeder intended to harm her, McCullough replied: "I don't know what her purpose was."

We disagree that the evidence was insufficient in this regard.[9] Intent may generally be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). "Intent to defraud has been defined as the intent to cause another to rely upon the falsity of a representation, such that the other person is induced to act or to refrain from acting." *Martinez v. State*, 6 S.W.3d 674, 678 (Tex. App.—Corpus Christi 1999, no pet.) (finding sufficient evidence to support conviction for tampering with governmental records) (citing 41 TEX. JUR. 3D *Fraud and Deceit* § 9 (1998)); *see Garcia v. State*, 630 S.W.2d 303, 305 (Tex. App.—

---

[9] There appears to have been no evidence adduced at trial as to Schroeder's actual date of birth or address. Nevertheless, Schroeder does not argue on appeal that the evidence was insufficient to establish that she used McCullough's date of birth or address, as alleged in the indictment. Even if Schroeder did make this argument, it would not be meritorious because the evidence was clearly sufficient to establish that she used McCullough's name. *See Anderson v. State*, 717 S.W.2d 622, 631 (Tex. Crim. App. 1986) (noting that it is proper for an indictment to allege various manners and means of committing an offense in the conjunctive, and for those different methods of committing the offense to be charged to the jury in the disjunctive); *Negrini v. State*, 853 S.W.2d 128, 134 (Tex. App.—Corpus Christi 1993, no pet.) (same).

11

Houston [1st Dist.] 1981, no pet.) (noting in a forgery case that the use of deception, such as giving false information, is evidence of intent to defraud and harm). "Harm" is defined in the penal code as "anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested." Tex. Penal Code Ann. § 1.07(a)(25) (West, Westlaw through 2013 3d C.S.). Here, LaCross testified that, when he stopped Avina's car on September 10, 2012 for driving at night without headlights, Schroeder told him that her name was Elizabeth McCullough and that her date of birth was January 16, 1963. The actual Elizabeth McCullough testified that she was not involved in a traffic stop on that date and had not given Schroeder consent to use her identifying information. McLelland testified that the female appearing in the September 10 traffic stop video "clearly" matched the picture in Schroeder's driver's license record, and that Schroeder admitted to using McCullough's identifying information when he interviewed her in jail. It is reasonable to conclude from this evidence that Schroeder identified herself as McCullough with, at the very least, the intent to cause LaCross "to rely upon the falsity of a representation such that [he] is induced to act or to refrain from acting." *See Martinez*, 6 S.W.3d at 678. In particular, a juror could have reasonably inferred from this evidence that Schroeder identified herself as McCullough in order to induce LaCross to refrain from further investigating Schroeder or from citing her for an offense.

Schroeder additionally contends that McCullough was not harmed because "[t]here is no evidence in the record of any citation, arrest, or warrant in McCullough's name as a result of LaCross's traffic stop." That may be true, but *actual* harm upon the person whose identifying information was fraudulently used is not an element of the

12

offense. *See* TEX. PENAL CODE ANN. § 32.51(b). In any event, there is evidence that McCullough was actually harmed. When McCullough was asked whether she had been "harmed in any financial way or lost any money over this deal," she replied: "Yes, I have. . . . I have a bank account that is now closed. I have child support money that has been missing." When McLelland was asked whether McCullough had been harmed or defrauded, he stated that, because of Schroeder's fraudulent identification as McCullough, "[McCullough's] name was listed in the police report when it should not have been." The fact that McCullough was never arrested or formally charged with a crime as a result of Schroeder's actions does not mean that McCulllough was not harmed, and it does not mean Schroeder could not have harbored an intent to harm or defraud another.

Schroeder finally argues by this issue that "[her] conduct does not constitute the type of conduct that Section 32.51 prohibits" because "[c]ase law clearly reflects that the subject and purpose of Section 32.51 is to prevent identity theft while the subject of Section 38.02 is to ensure police officers receive accurate information." *See, e.g., Jones v. State*, 396 S.W.3d 558, 563 (Tex. Crim. App. 2013). We disagree. As noted, the evidence adduced at trial was sufficient to establish the essential elements of the offense of fraudulent use or possession of identifying information. On the other hand, the offense of failure to identify, defined in penal code section 38.02, would not have been supported because there was no evidence that Schroeder was under arrest at the time she provided the fraudulent identification. *See* TEX. PENAL CODE ANN. § 38.02(a) (West, Westlaw through 2013 3d C.S.). It is true that the purpose of section 38.02 is to prevent people from providing false information to police, *see Jones*, 396 S.W.3d at 562, and that Schroeder is accused of doing exactly that; but the purpose of section 32.51 is to ensure

13

that people do not have their identities stolen, *see id.*, and Schroeder is accused of doing exactly that as well. Moreover, the statute under which she was charged and convicted states: "If conduct that constitutes an offense under this section also constitutes an offense under any other law, the actor may be prosecuted under this section, the other law, or both." TEX. PENAL CODE ANN. § 38.51(e); *see Jones*, 396 S.W.3d at 562. In light of these considerations, we find no reason why section 32.51 would not apply to Schroeder's actions as alleged in the indictment and as proven beyond a reasonable doubt at trial.

Schroeder's first issue is overruled.

### 2. Enhancement Paragraphs

By her seventh and eighth issues, Schroeder contends that the evidence was insufficient to support the jury's findings as to the two enhancement paragraphs in both cause numbers.[10] A hypothetically correct jury charge, consistent with the indictment, would state that the enhancement paragraphs are true if: (1) prior to the commission of the charged offenses, Schroeder was finally convicted of felony criminal mischief in Tarrant County Criminal District Court Number 1, cause number 0514862D; and (2) prior to the commission of the charged offenses and prior to the commission of the aforementioned criminal mischief offense, Schroeder was finally convicted of felony credit card abuse in the 204th District Court of Dallas County, cause number F-8772294. *See* TEX. PENAL CODE ANN. § 12.425(a) (West, Westlaw through 2013 3d C.S.)[11]; *Young*, 14

---

[10] The verdict form in each punishment charge gave the jury only two options: "Both paragraphs true" and "Both paragraphs not true." The jury found both paragraphs true in both cases.

[11] Penal code section 12.425, regarding penalties for repeat and habitual felony offenders in state-jail felony trials, states:

> (a)    If it is shown on the trial of a state jail felony punishable under Section 12.35(a) that the defendant has previously been finally convicted of *two state jail felonies*

14

S.W.3d at 750; *see also Derichsweiler v. State*, 359 S.W.3d 342, 349 (Tex. App.—Fort Worth 2012, pet. ref'd) ("Generally, the State must prove enhancement allegations as alleged in the indictment.").

To establish that Schroeder was convicted of prior offenses, the State had to prove beyond a reasonable doubt that (1) the prior convictions exist, and (2) Schroeder was the defendant in those prior convictions. *See Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). No specific document or mode of proof is required to prove these two elements. *Id.*

> While evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, the State may prove both of these elements in a number of different ways, including: (1) the defendant's admission or stipulation, (2) testimony by a person who was present when the person was convicted of the specified crime and can identify the defendant as that person, or (3) documentary proof (such as a judgment) that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted.

*Id.* at 921–22 (footnotes omitted).

> [O]rdinarily the proof that is adduced to establish that the defendant on trial is one and the same person that is named in an alleged prior criminal conviction or convictions closely resembles a jigsaw puzzle. The pieces standing alone usually have little meaning. However, when the pieces are

punishable under Section 12.35(a), on conviction the defendant shall be punished for a felony of the third degree.

(b)     If it is shown on the trial of a state jail felony punishable under Section 12.35(a) that the defendant has previously been finally convicted of *two felonies other than a state jail felony* punishable under Section 12.35(a), and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction the defendant shall be punished for a felony of the second degree.

(c)     If it is shown on the trial of a state jail felony for which punishment may be enhanced under Section 12.35(c) that the defendant has previously been finally convicted of *a felony other than a state jail felony* punishable under Section 12.35(a), on conviction the defendant shall be punished for a felony of the second degree.

TEX. PENAL CODE ANN. § 12.425 (West, Westlaw through 2013 3d C.S.) (emphasis added). The indictments and the jury charges allege that Schroeder was twice previously convicted of felonies, but they do not state whether or not those felonies were state-jail felonies.

15

fitted together, they usually form the picture of the person who committed that alleged prior conviction or convictions.

*Human v. State*, 749 S.W.2d 832, 835–36 (Tex. Crim. App. 1988) (op. on reh'g).

State's Exhibits 4 and 5, which were admitted at the punishment phase over defense counsel's objections, constitute the only evidence of prior convictions in the instant case.[12] Exhibit 4 contains certified copies of a docket sheet, indictment, and judgment indicating that "Traci Sheppard Schroeder" was convicted on April 5, 1994 of third-degree felony criminal mischief in Tarrant County Criminal District Court Number One, cause number 0514861D. The docket sheet is partially illegible but "/03/62" appears next to the defendant's name. Exhibit 5 appears to contain six separate documents in reverse chronological order. The first document is a judgment, dated July 27, 1990, convicting a defendant of third-degree felony credit card abuse and imposing a two-year prison term. The copy of the judgment that appears in the record before this Court does not contain the defendant's name. The second document is a complaint, dated July 12, 1990, alleging that "Traci Leigh Schroeder" was convicted of felony credit card abuse in 1987 and that she violated conditions of her probation. The third document is an undated judgment finding "Traci Sheppard Schroeder" guilty of felony credit card abuse, sentencing her to five years' imprisonment, suspending the prison sentence, and placing her on probation for five years. The fourth document is a complaint, dated August 11, 1988, alleging that "Traci Leigh Schroeder" had been previously convicted of felony credit

---

[12] Schroeder contends by her fifth and sixth issues that Exhibits 4 and 5 were inadmissible. However, she does not support these issues with citations to authority or record references; accordingly, they are waived. *See* TEX. R. APP. P. 38.1(i). We note that certified copies of a judgment are self-authenticating under the rules of evidence and are generally admissible at the punishment phase to establish prior convictions. *See* TEX. R. EVID. 902(4); *Beck v. State*, 719 S.W.2d 205, 210 (Tex. Crim. App. 1986) (noting that certified copies of a judgment and sentence, "while admissible, are not normally sufficient standing alone to prove" prior convictions).

card abuse and that she violated conditions of her probation. The fifth document is a signed "Judicial Confession" admitting to the felony credit card abuse allegations. The sixth document is an indictment alleging that "Traci Sheppard Schroeder" committed felony credit card abuse on or about April 4, 1987. The two complaints for probation violations each contained signatures appearing to be that of Schroeder, acknowledging receipt of the documents.[13]

In support of her issues, Schroeder cites *Beck v. State*, in which the Texas Court of Criminal Appeals stated that certified copies of a judgment and sentence "are not normally sufficient standing alone to prove" prior convictions, "even if the name on the judgment and sentence and in the pen packet is the same as the defendant in trial." 719 S.W.2d 205, 210 (Tex. Crim. App. 1986) (citing *Daniel v. State*, 585 S.W.2d 688 (Tex. Crim. App. 1979); *Cain v. State*, 468 S.W.2d 856 (Tex. Crim. App. 1971); *Elizalde v. State*, 507 S.W.2d 749, 752 (Tex. Crim. App. 1970); *Vessels v. State*, 432 S.W.2d 108 (Tex. Crim. App. 1968); *Franklin v. State*, 227 S.W.2d 814 (Tex. Crim. App. 1950); *Phariss v. State*, 194 S.W.2d 1007, 1007 (Tex. Crim. App. 1946)); *see Prihoda v. State*, 352 S.W.3d 796, 808–10 (Tex. App.—San Antonio 2011, pet. ref'd) (finding insufficient evidence to support enhancement where only evidence linking appellant to prior conviction was (1) his full name on the prior conviction judgment, (2) his signature on that judgment, and (3) a police officer's vague response to a single question about a prior DWI); *see also*

---

[13] Exhibit 5 does not contain a certification page or any other indication that the documents therein are certified copies of the originals. However, the exhibit does contain a document prepared by a representative of the Dallas County Criminal District Attorney's office, dated April 9, 2013, requesting certified copies of "Court Dispositions and Probable Cause Affidavits" in district court cause number F87-72294. Additionally, as Schroeder concedes on appeal, the prosecutor "specifically referred to the certification during publication of the exhibit to the jury" and "defense counsel did not make any different representation or indicate that it was not certified." Schroeder's appellate counsel states that he therefore "has no reason to believe that this exhibit was not certified." Accordingly, we assume for purposes of this opinion that the documents contained in Exhibit 5 are certified copies.

*Flowers*, 220 S.W.3d at 925 (Johnson, J., concurring) (noting that "[c]learly, we must not depend only on a name or even a name and a birth date" in linking a defendant to prior convictions)[14]; *Demers v. State*, No. 05-11-01704-CR, 2013 WL 323446, at *3 (Tex. App.—Dallas Jan. 29, 2013, no pet.) (not designated for publication) ("[E]ven if the name on the judgment is the same as that of the accused at trial, the State must present independent evidence that the accused is the same person previously convicted."); *Hensley v. State*, No. 02-13-00190-CR, 2014 WL 1999307, at *4–5 (Tex. App.—Fort Worth May 15, 2014, no pet.) (mem. op. per curiam, not designated for publication) (finding that fingerprint expert's testimony regarding documents not admitted into evidence was insufficient to link appellant to prior convictions). Instead, "[i]t is incumbent on the State to go forward and show by independent evidence that the defendant is the person so previously convicted." *Beck*, 719 S.W.2d at 210.

The State argues that, based on the "puzzle pieces" contained in Exhibits 4 and 5, "the jury could have rationally determined that it was unlikely that someone other than the Appellant, with the same name, date of birth, race and gender, was responsible for the offenses." *See Flowers*, 220 S.W.3d at 923 ("The trier of fact fits the pieces of the jigsaw puzzle together and weighs the credibility of each piece."); *Benton v. State*, 336 S.W.3d

---

[14] In her concurring opinion in *Flowers v. State*, Judge Johnson, joined by Judge Price, stated:

> Assuring that a sufficient connection exists requires at least two things: 1) enough information to establish that the conviction can be connected to its proper owner; and 2) the information is sufficiently corroborated. More information makes the connection more reliable. Clearly, we must not depend only on a name or even a name and a birth date. An inexhaustive list of factors that might be considered includes: full name, date of birth, Social Security number, what the prior offense was, the place and date of the prior offense, the date of conviction, testimony about the prior conviction from a corrections, parole, or probation officer, or the prosecutor of the prior conviction. However the information is produced, it must sufficiently connect the defendant to the prior offense.

220 S.W.3d 919, 925 (Tex. Crim. App. 2007) (Johnson, J., concurring).

18

355, 359–60 (Tex. App.—Texarkana 2011, pet. ref'd) (noting that "[g]enerally, a name alone is insufficient to connect a defendant to a prior judgment" but that "the name alone is not the sole evidence connecting Benton to the prior convictions" and, in any event, "it is quite unlikely that another by the name of Courtney Antoine Benton was convicted in Harris County, Texas, within the time frames listed in those prior convictions").

We find that the evidence was insufficient to link Schroeder to the prior convictions. We note that it is not enough for the State to prove that it is "unlikely" that someone other than Schroeder was convicted of the offenses as evidenced by the exhibits; instead, the State must establish *beyond a reasonable doubt* that Schroeder was convicted of those offenses. *See Flowers*, 220 S.W.3d at 921. Here, none of the documents in either exhibit contain any identifying characteristics that match those of Schroeder other than her first and last names. The judgment of conviction in Exhibit 5 does not even state Schroeder's name. The State contends that Exhibit 4 established that the person convicted of criminal mischief also shared Schroeder's date of birth, but we do not find a full date of birth anywhere in the exhibit. More importantly, there was no evidence adduced at either the guilt-innocence phase or the punishment phase as to Schroeder's *actual* date of birth.[15] Therefore, even if Exhibit 4 clearly showed the date of birth of the person convicted of criminal mischief—including month, day, and year—that information could not link Schroeder to the offense because the jury could not have known Schroeder's actual date of birth.[16] Similarly, though the complaints and judicial confession in Exhibit 5 contain the

---

[15] The State did not seek to re-admit evidence from the guilt-innocence phase at the punishment phase.

[16] The request for certified copies referenced *supra* note 13, which was prepared by the prosecuting attorney's office, lists the convicted person's name as "Traci Sheppard Schroeder," her date of birth as "10/03/1962," her gender as "female," and her race as "white." However, as noted, there was no evidence before the jury regarding Schroeder's actual date of birth. And, to whatever extent the request may be

19

signature of the person convicted of credit card fraud—and even though the signatures appear to state "Traci Schroeder"—there was no evidence adduced at trial as to Schroeder's actual signature. The signatures therefore merely show that someone named "Traci Schroeder" was charged with credit card fraud; they do not link Schroeder to the offense beyond the fact that she shares the same first and last names as that of the charged person.

Because the only "puzzle piece" linking Schroeder to the convictions is her name, the evidence was insufficient to support a finding that both enhancement paragraphs were true. *See Beck*, 719 S.W.2d at 210; *Prihoda*, 352 S.W.3d at 808–10.[17] We sustain Schroeder's seventh and eighth issues and reverse those portions of the judgments finding the enhancement paragraphs true.

## B.     Shackling During Trial

Schroeder argues by her fourth issue that the trial court erred by "requir[ing] [her] to wear shackles during trial."

The appearance of a defendant in shackles before a jury during a trial can violate the defendant's Fifth and Fourteenth Amendment rights to due process. *Deck v. Missouri*, 544 U.S. 622, 629–34 (2005) (citing U.S. CONST. amends. V, XIV). Visible shackling

---

considered "evidence" of the convicted person's gender and race, we do not believe that such evidence establishes any substantial link between the convicted person and Schroeder that was not already established by the fact that the two share first and last names, which, as noted, is insufficient by itself to support enhancement. *See, e.g., Beck*, 719 S.W.2d at 210.

[17] *Flowers* and *Benton* are distinguishable because, in those cases, there was far more than just a name to link the appellant with the prior convictions. *See Flowers*, 220 S.W.3d at 925 (evidence included a certified copy of a printout of a conviction which "set out the date of birth, address, social security number, and other personal descriptors" of the convicted person; and appellant's driver's license record, which contained a name, date of birth, address, and personal descriptors matching those contained in the conviction printout as well as a picture "which the trial court could use to compare to the person standing before him"); *Benton v. State*, 336 S.W.3d 355, 359–60 (Tex. App.—Texarkana 2011, pet. ref'd) (evidence linking appellant to conviction included his name, date of birth, his signature, and the identity of appellant's mother, all of which appeared on the prior felony conviction and matched evidence already before the jury).

20

"undermines the presumption of innocence and related fairness of the factfinding process," "can interfere with the accused's ability to communicate with his lawyer" and "participate in his own defense," and "affronts the dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Id.* at 630–31 (quotations and citations omitted). Accordingly, a defendant has the right to appear at trial unbound by visible shackles except "in extreme and exceptional cases, where the safe custody of the prisoner and the peace of the tribunal imperatively demand" otherwise. *Bell v. State*, 415 S.W.3d 278, 281 (Tex. Crim. App. 2013) (noting that visible shackling is "only justified when, in the trial judge's discretion, it is necessary for a particular defendant in a particular proceeding"); *see Deck*, 544 U.S. at 628 (noting that visible shackling may be justified "in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum"). "[E]ven when exceptional circumstances or a manifest need for such restraint exists, the trial judge should make all efforts to prevent the jury from seeing the defendant in shackles." *Bell*, 415 S.W.3d at 281. It is within the discretion of the trial judge as to whether a defendant shall be tried in handcuffs or shackles, and we review the trial court's decision for abuse of that discretion. *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991).

Here, prior to voir dire and outside the presence of the venire, the trial court noted that "there's an issue about leg irons on the defendant. The defendant—the defendant has chosen to wear a dress for the trial and she is in leg irons." Schroeder stated on the record that she had no objection to wearing the leg irons in front of the jury. Subsequently, after an off-the-record conversation regarding another case and still outside the presence of the venire, defense counsel noted that Schroeder "has a bracelet on her arm that's

apparent to the jury, which the Sheriff says they cannot remove, that indicates that she's in custody." Counsel stated: "I object to the bracelet being in the view of the jury. I object to the bracelets on her legs being in the view of the jury. I object to her wearing pants to cover that." The prosecutor then called a witness to testify—again, outside the presence of the venire—regarding a motion to suppress evidence filed by Schroeder. After the witness testified, the following exchange took place:

THE COURT: On the record. The defense has now provided the defendant with a jacket that is long-sleeved that covers her arms, including the band. Also, the defendant has been provided long pants that will cover or hide her ankle bracelet.

Is there any objection at this point from the defense?

[Defense counsel]: No, Your Honor.

The venire panel was then brought into the courtroom and the State began voir dire. No further mention of shackles or bracelets appears in the record.

To preserve an issue for appellate review, a party must (1) present to the trial court a timely and specific objection and (2) show that the trial court explicitly or implicitly ruled on the objection or that it refused to rule and the party objected to the refusal. TEX. R. APP. P. 33.1(a). Even issues that implicate a defendant's constitutional right to a fair trial may be waived if not preserved in this manner. *See, e.g., Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014).[18] Schroeder initially advised the trial court that she had no objection to her manner of appearance before the jury, and her counsel did not object

---

[18] Errors affecting "absolute rights" or rights that are "not forfeitable" need not be preserved by objection at trial. *See, e.g., Garza v. State*, 435 S.W.3d 258, 260 (Tex. Crim. App. 2014). However, Schroeder directs to no authority, and we find none, establishing that the right to appear unshackled at trial is such a right. Instead, case law supports the contrary proposition. *See Moughon v. State*, 967 S.W.2d 900, 901 (Tex. App.—Fort Worth 1998, no pet.) (noting that "jurors seeing a defendant wearing handcuffs does not constitute egregious error" for which no trial objection is required).

22

at that time. Although her counsel later reversed himself and objected to "the bracelet being in the view of the jury," the record shows that, once his concerns were addressed, he withdrew his objection. For these reasons, Schroeder's fourth issue has not been preserved for our review. *See* TEX. R. APP. P. 33.1(a); *Cedillos v. State*, 250 S.W.3d 145, 150 (Tex. App.—Eastland 2008, no pet.) (concluding that appellant waived his constitutional due process complaint regarding shackling during trial because he failed to object on the record); *see also Kelley v. State*, No. 05-09-01438-CR, 2012 WL 2628074, at *5–6 (Tex. App.—Dallas July 6, 2012, pet. ref'd) (mem. op., not designated for publication) (same); *Pereida v. State*, No. 13-09-00354-CR, 2010 WL 2783743, at *6 (Tex. App.—Corpus Christi July 15, 2010, pet. ref'd) (mem. op., not designated for publication) (same).

Even if the issue were preserved, any error would be harmless because there is no evidence in the record that the jury was ever aware of the shackles or bracelets. *See* TEX. R. APP. P. 44.2(b) (stating that any non-constitutional error "that does not affect substantial rights must be disregarded"); *Bell*, 415 S.W.3d at 283 (holding that error in ordering appellant to be shackled during trial was harmless under Rule 44.2(b) because there was no "reasonable probability that the jury was aware of the defendant's shackles"); *see also Canales v. State*, 98 S.W.3d 690, 697–98 (Tex. Crim. App. 2003) (holding that any error in allowing appellant to be shackled during trial would be harmless because "[n]othing in the record indicates that the jury ever saw or heard or was otherwise aware that appellant was wearing shackles"); *Cooks v. State*, 844 S.W.2d 697, 722–23 (Tex. Crim. App. 1992) (same where there was no evidence that the "shackles were actually seen by the jury"). The record instead shows that, prior to the entrance of the

23

venire panel into the courtroom, Schroeder was provided with attire that concealed the shackles and bracelets on her arms and legs.

We overrule Schroeder's fourth issue.

## C. Jury Charge Error

By her second issue, Schroeder contends that the trial court erred by refusing her request to include the statutory definition of "harm" in the jury charge pertaining to the fraudulent identification allegations because "intent to harm or defraud" is an essential element of the offense. *See* TEX. PENAL CODE ANN. § 32.51(b). At the charge conference, defense counsel requested that the jury be instructed on the definition of "harm" contained in penal code section 1.07. *See* TEX. PENAL CODE ANN. § 1.07(a)(25) ("'Harm' means anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested."). The trial court denied the request, stating that she "does not believe" that the section 1.07 definition "applies in this case."

The trial court is required to give the jury a written charge that, among other things, "set[s] forth the law applicable to the case . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West, Westlaw through 2013 3d C.S.). The "law applicable to the case" includes "statutory definitions that affect the meaning of the elements of the offense." *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011); *see Watson v. State*, 548 S.W.2d 676, 679 n.3 (Tex. Crim. App. 1977) ("The trial court should always include the statutory definitions in its jury instructions where applicable."). Trial courts have "broad discretion" in submitting proper definitions and explanatory phrases to aid the jury. *Nava v. State*, 379 S.W.3d 396, 420 (Tex. App.—Houston [14th Dist.] 2012), *aff'd*, 415 S.W.3d 289 (Tex.

24

Crim. App. 2013); *Deener v. State*, 214 S.W.3d 522, 529 (Tex. App.—Dallas 2006, pet. ref'd); *see Shipp v. State*, 331 S.W.3d 433, 444 (Tex. Crim. App. 2011) (Meyers, J., concurring). But a trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004).

We assume, for purposes of this analysis, that the trial court's refusal to instruct the jury on the statutory definition of "harm" was error.[19] Because defense counsel properly requested the instruction at trial, the error will be reversible only if we find that it resulted in at least "some harm" to Schroeder's rights. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999). It is Schroeder's burden to prove that she "suffered some actual, rather than merely theoretical, harm from the error." *Dickey*, 22 S.W.3d at 492. "Nevertheless, the presence of any harm, regardless of degree, is sufficient to require a reversal of the conviction." *Id.*

Schroeder contends on appeal that she suffered harm from the exclusion of her requested definition because "this Court cannot be certain that the jury considered the proper standard of 'harm' during its deliberations"; because "[t]he intent element of the charged offense was a highly disputed issue"; and because "[t]here is no evidence in the record that would lead a jury to reasonably conclude that [Schroeder] possessed the requisite intent to cause a loss, disadvantage, or injury to the officer or the complaining witness as a result of her actions during the traffic stop."

---

[19] We note that the definitions provided in section 1.07 are applicable to the entire penal code. TEX. PENAL CODE ANN. § 1.07(a) (West, Westlaw through 2013 3d C.S.).

We disagree. We have already concluded that the evidence was sufficient to establish Schroeder's culpable intent under a hypothetically correct jury charge. Further, although the intent element was indeed hotly disputed, the exclusion of Schroeder's requested instruction could not have feasibly worked to her detriment because, when a term is left undefined, the jury is assumed to have considered the "commonly understood meaning" of the term. *See Olveda v. State*, 650 S.W.2d 408, 409 (Tex. Crim. App. 1983). In *Olveda*, a robbery case, the Texas Court of Criminal Appeals concluded that the omission from the jury charge of the statutory definition of "in the course of committing theft" was harmless error. *Id.* at 408–09. The Court reasoned:

> [W]hen the statutory definition[20] is not included in the charge, it is assumed the jury would consider the commonly understood meaning in its deliberations. Although error could result where the common meaning is more expansive than the statutory definition, such is not the case with the phrase "in the course of committing theft." Any possible misunderstanding of the phrase would have been more restrictive than the statutory definition, and could only have been to appellant's benefit. No reversible error is shown.

*Id.* at 409. In *Nejnaoui v. State*, the Fourteenth Court of Appeals held, in an aggravated assault case, that the reasoning in *Olveda* applies to the statutory definition of "conduct." 44 S.W.3d 111, 120 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). The statutory definition of "conduct" is "an act or omission and its accompanying mental state," *id.* (citing TEX. PENAL CODE ANN. § 1.07(a)(10)); whereas the common meaning of the term is "the act, manner, or process of carrying on . . . a mode or standard of personal behavior esp[ecially] as based on moral principles." *Id.* (citing WEBSTER'S NEW COLLEGIATE DICTIONARY 235 (1977 ed.)). The *Nejnaoui* court held that "[t]he statutory definition of

---

[20] The statutory definition of "in the course of committing theft" is "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *Id.* § 29.01(1) (West, Westlaw through 2013 3d C.S.).

26

conduct is 'neither complex nor unusual, and the definition is much like the common meaning of the word.'" *Id.* (quoting *Smith v. State*, 959 S.W.2d 1, 25 (Tex. App.—Waco 1997, pet. ref'd)).

We believe that the reasoning in *Olveda* also applies here. The common, dictionary definition of "harm" is "physical or mental damage or injury." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/harm (last visited Apr. 7, 2015). As in *Olveda* and *Nejnaoui*, the common definition of the term at issue is more restrictive than the statutory definition. *See Olveda*, 650 S.W.2d at 409; *Nejnaoui*, 44 S.W.3d at 120.[21] As noted, the common definition states that "harm" must be "physical or mental" in nature, whereas under the statutory definition "harm" may be "*anything reasonably regarded as loss, disadvantage, or injury*. . . ." TEX. PENAL CODE ANN. § 1.07(a)(25) (emphasis added). The common, dictionary definition of "harm" is more restrictive because it does not include injuries that are not physical or mental in nature— such as, for example, pecuniary loss. Accordingly, to the extent the jury used the common definition of "harm" rather than the statutory definition, that could only have redounded to Schroeder's benefit because it would have limited the circumstances under which the jury could have found her guilty. *See Olveda*, 650 S.W.2d at 409.

We conclude that Schroeder did not meet her burden to establish that she suffered at least some "actual harm" from the trial court's refusal to include her requested definition

---

[21] The *Nejnaoui* court did not explicitly state that the common definition of "conduct" is more restrictive than the statutory definition. However, that conclusion is supported by that court's analysis. In particular, as the court noted, the statutory definition of "conduct" includes an act *and its accompanying mental state*, whereas the common definition merely refers to an "act, manner or process" of behavior. *Nejnaoui v. State*, 44 S.W.3d 111, 120 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

27

in the jury charge. *See Dickey*, 22 S.W.3d at 492; *Almanza*, 686 S.W.2d at 171. Her second issue is overruled.

## D.    Admission of Drug Evidence

By her third issue, Schroeder contends that the trial court erred by admitting evidence of the methamphetamine obtained from under the battery of a mobile phone that LaCross found in her purse. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (West, Westlaw through 2013 3d C.S.) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case."). We review the admission of evidence under an abuse of discretion standard. *Winegarner v. State,* 235 S.W.3d 787, 790 (Tex. Crim. App. 2007).

### 1.    Applicable Law

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Among the exceptions to the warrant requirement is a search incident to a lawful arrest. *Id.*

> The justification for permitting [a warrantless search incident to arrest] is (1) the need for officers to seize weapons or other things which might be used to assault [a]n officer or effect an escape, and (2) the need to prevent the loss or destruction of evidence. A search is incident to arrest only if it is "substantially contemporaneous" with the arrest and is confined to the area within the immediate control of the arrestee. Thus, a search incident to

28

arrest cannot normally be justified if the search is remote in time or place from the arrest or no exigency exists.

*State v. Granville*, 423 S.W.3d 399, 410 (Tex. Crim. App. 2014) (internal quotations omitted) (citing *United States v. Chadwick*, 433 U.S. 1, 15 (1977); *United States v. Robinson*, 414 U.S. 218, 224–26 (1973); *Vale v. Louisiana*, 399 U.S. 30, 33 (1970)).

## 2.    Suppression Hearing

At a pre-trial hearing on Schroeder's motion to suppress the drug evidence, LaCross testified that he stopped Avina's car on September 13, 2012[22] because the driver "[f]ailed to signal a turn."  LaCross obtained Avina's identification and then asked Schroeder if she had any identification.  She did not.  At that point, LaCross "got her out and placed her under arrest" pursuant to the warrant that had been issued for her arrest. LaCross asked Schroeder to put her purse back in the vehicle "[s]o that she didn't have anything in her hands when I placed her under arrest."  Avina then gave LaCross consent to search the vehicle.  LaCross found no evidence of criminal activity in his search of the vehicle.  He "gathered [Schroeder]'s personal property"—i.e., her purse—"and took her to jail."  LaCross clarified that when he "got the purse," Schroeder asked LaCross if he would leave the purse with Avina.  LaCross refused to do so because "she had been arrested for a warrant for stuff dealing with identity theft, and there's a possibility that other items could be related to that crime in her purse."  LaCross stated that it is "typical" for him to take an arrestee's personal property, whether or not he believes the property is related to the offense.

---

[22] LaCross initially stated the traffic stop occurred on September 12.  Later, after being shown his police report to refresh his memory, he corrected his testimony.

29

When LaCross arrived at the jail with Schroeder, he followed his "standard procedure," which he described as follows: "Separate the property that they have between the stuff that would be concealed in a bag and the stuff that they could have access to, like money, credit cards, cellphone, search the property, make sure there's no contraband so that isn't going to the jail." He stated: "She had two cellphones [in the purse], one without a battery, one with a battery, and I took off the back, and behind the battery was a small amount of methamphetamine." On cross-examination, LaCross agreed with defense counsel that his intent, at the time he took the purse, was to search the purse for "further evidence of the warrant that I was arresting her for." When asked whether he had "reasonable suspicion or probable cause to believe that there was evidence in the purse associated with her arrest," LaCross replied: "Yes. She had—she had already lied to me. She had possession of ID the first time I talked to her that wasn't hers.[23] So all those things gave me reason to believe that there could have been evidence of this crime."

The trial court denied the motion to suppress. In pronouncing its ruling, the trial court stated:

> The Court having listened to the testimony presented by the witness, the Court is in agreement with the State. Gant does have a two-prong test. The first, which has to do with officer safety, and certainly if the defendant was in the car [sic] of the police department, that addresses that issue.
>
> However, it also—the second prong has to do with evidence at the crime that could have been destroyed that was with the defendant. And, clearly, her purse could contain evidence of the crimes, specifically, the ID that she had presented earlier, or any other identification that she might have had in her purse.

---

[23] This testimony contradicts LaCross's testimony given later at trial that Schroeder was not able to produce identification at the September 10 traffic stop.

30

And for that reason, the Court is going to allow—is going to deny your Motion to Suppress and allow the State to present that evidence.

### 3.  Analysis

Schroeder argues that the search was unreasonable because "it was not substantially contemporaneous with the arrest and the justifications for a search incident to arrest were no longer present."  She notes that "[t]he purpose of a search incident to arrest is to seize weapons that could be used against the police officer and to prevent the destruction of evidence of the crime" but that, at the time of the search, she "no longer had possession of the purse and could not have easily accessed it to retrieve any weapon or destroy any evidence."

Schroeder relies on *Gant*, where the appellant was arrested for driving with a suspended license, handcuffed, and locked in the back of a patrol car.  556 U.S. at 335.  Police then searched the appellant's car and discovered his jacket, which contained cocaine.  *Id.*  The United States Supreme Court stated:

> In *Chimel* [*v. California*, 395 U.S. 752, 763 (1969)], we held that a search incident to arrest may only include "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."  *Ibid.*  That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy.  *See ibid.* (noting that searches incident to arrest are reasonable "*in order to* remove any weapons [the arrestee] might seek to use" and "*in order to* prevent [the] concealment or destruction" of evidence (emphasis added)).  If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply.

*Gant*, 556 U.S. at 339.  The Court concluded that the warrantless search in that case was unreasonable because (1) the appellant "could not have accessed his vehicle at the time

31

of the search," and (2) appellant "was arrested for driving with a suspended license—an offense for which police could not expect to find evidence in the passenger compartment of [appellant]'s car." *Id.* at 343–44 (noting that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle") (quotations omitted). The Court therefore concluded that "[n]either the possibility of access nor the likelihood of discovering offense-related evidence authorized the search in this case." *Id.* at 344.

The State argues *Gant* is inapplicable, citing case law establishing that police are entitled to search a suspect's personal effects, including a purse, as part of a search incident to a lawful arrest. In *Stewart v. State*, the appellant was arrested after she was observed shoplifting. 611 S.W.2d 434, 435 (Tex. Crim. App. [Panel Op.] 1981). After the officer took the appellant to the police station to be booked for theft, another officer noticed appellant's nose was running, a condition which he knew commonly resulted from cocaine use. *See id.* There was also evidence that appellant had stated "she needed to thieve because a dope deal was going on." *Id.* The officer took appellant's purse and found a prescription bottle containing cocaine. *Id.* A panel of the Texas Court of Criminal Appeals held that the search was valid, noting that "[a] search incident to . . . lawful arrest requires no warrant if it is restricted to a search of the person *or of objects immediately associated with the person of the arrestee.*" *Id.* at 436 (emphasis added) (citing *Robinson*, 414 U.S. 218). The Court held that a purse is an item "immediately associated with a person" because it is typically "carried with a person at all times" "in the sense that a wallet or items found in pockets are." *Id.* at 438. The Court distinguished purses from other items which courts have held were not properly part of a "full search of the person," such as

briefcases, attaché cases, guitar cases, sealed cardboard boxes, unlocked backpacks and duffel bags. *Id.* at 437 (listing cases); *see United States v. Lee*, 501 F.2d 890, 892 (D.C. Cir. 1974) (holding that, because officers had probable cause to arrest, they were entitled to "search [appellant's] purse incident thereto").

We find that the search was reasonable. Having lawfully arrested Schroeder, LaCross was entitled to search her "personal effects," including her purse.[24] *See Stewart*,

---

[24] As noted, the evidence which Schroeder sought to suppress was not only found within her purse, but—more specifically—was found underneath the battery of a cell phone that was in the purse. Under the applicable case law, LaCross was entitled to search the purse incident to his arrest of Schroeder; but the question of whether LaCross was also entitled to pry open the battery compartment of the phone to search for evidence is an entirely different matter. In this regard, it is noteworthy that both the United States Supreme Court and the Texas Court of Criminal Appeals have recently concluded that the *data* contained within an arrestee's cell phone is not properly within the scope of a search incident to arrest. *See Riley v. California*, 134 S.Ct. 2473, 2495 (U.S. 2014) ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant."); *State v. Granville*, 423 S.W.3d 399, 417 (Tex. Crim. App. 2014) (noting that "a cell phone is not like a pair of pants or a shoe . . . . [A] citizen does not lose his reasonable expectation of privacy in the contents of his cell phone merely because that cell phone is being stored in a jail property room" and concluding that the officer "could have seized appellant's phone and held it while he sought a search warrant, but, even with probable cause, he could not 'activate and search the contents of an inventoried cellular phone' without one").

Nevertheless, as the State notes, Schroeder did not argue to the trial court that LaCross's search was unreasonable because it extended to the contents of her cell phone. Instead, defense counsel raised only the following grounds at the suppression hearing:

> In this particular case, Your Honor, Arizona versus Gant, I believe, is the controlling law that covers this particular situation.

> She was arrested on a warrant that the officer knew about, stopped the vehicle, arrested her, took her out of the vehicle, put her in the back of his patrol car in handcuffs, secured her so that she couldn't get out and closed the door. He says that the driver gave him permission to search the vehicle, but not the purse.

> Under Gant, he is not allowed to search the purse as an incident to the arrest, which is what he testified that he did. He searched the purse incidental to the arrest. Gant doesn't allow that to happen. He can't take the purse and deprive her of her right to give it to the custody of someone else for safekeeping so that he can then take it to jail and search it.

> If Gant doesn't authorize him to search the purse at the scene with her handcuffed and secured in the back of his patrol car, certainly Gant doesn't allow him to then take the purse somewhere else and search it.

> I would ask the Court to suppress the evidence found in that purse as an unlawful search under the Fourth Amendment.

To the extent Schroeder argues on appeal that the battery compartment of an arrestee's cell phone is not properly within the scope of a search incident to arrest, we conclude that issue has not been preserved because it was never presented to the trial court; therefore, we do not address it. *See* TEX. R. APP. P. 33.1.

611 S.W.2d at 438; *Lee*, 501 F.2d at 892; *see also Robinson*, 414 U.S. at 224–26. Schroeder notes that the trial court based its ruling partly on the likelihood that "her purse could contain evidence of the crimes, specifically, the ID that she had presented earlier"; and she is correct that, despite LaCross's testimony at the suppression hearing, the evidence at trial established that Schroeder in fact never produced a physical identification card of any sort. However, the trial court also based its ruling on the possibility that the purse might contain "any other identification that she might have had." Here, because Schroeder was charged with fraudulently using identifying information, evidence of the crime would have included anything in Schroeder's purse that established her true identity. Therefore, even disregarding LaCross's dubious testimony that Schroeder "had possession of ID the first time I talked to her that wasn't hers," it was still reasonable for LaCross to suspect that Schroeder's purse contained evidence of the crime for which she was arrested. *Gant* is distinguishable for that reason. *Cf. Gant*, 556 U.S. at 344 (holding that "police could not reasonably have believed . . . that evidence of the offense for which [appellant] was arrested might have been found" in his car).

Schroeder further contends that the search, which took place after LaCross had transported her to jail, was unreasonable because it was not "substantially contemporaneous with the arrest." *See Granville*, 423 S.W.3d at 410. We disagree. The court of criminal appeals has held:

> Searches incident to arrest are not limited as a matter of law to those made at the instant a suspect is taken into police custody. Rather, the legal basis for concluding that such searches are reasonable within the meaning of the state and federal constitutions, i.e. to discover weapons, evidence, and contraband, is ordinarily applicable during the entire interval following arrest and leading ultimately either to detention of the suspect or to his release on bail pending formal accusation and trial. During this period, detainees suffer a diminished expectation of privacy. When booked into a detention facility,

34

they may be thoroughly searched without a warrant to make an inventory of their belongings.

*Rogers v. State*, 774 S.W.2d 247, 264 (Tex. Crim. App. 1989) (finding that search of appellant's sock after he was lawfully arrested and taken to the sheriff's office was valid because "appellant was still in custody of the arresting officers"), *overruled on other grounds by Peek v. State*, 106 S.W.3d 72 (Tex. Crim. App. 2003). The United States Supreme Court and federal appeals courts have also held that a search incident to arrest need not immediately follow the arrest, but instead "may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards*, 415 U.S. 800, 803, 803 n.4 (1974) (noting that "[t]he courts of appeals have followed this same rule, holding that both the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence" and collecting cases); *Abel v. United States*, 362 U.S. 217, 239 (1960); *United States v. Curtis*, 635 F.3d 704, 712 (5th Cir. 2011); *United States v. Hambrick*, 630 F.3d 742, 748 (8th Cir. 2011). The *Edwards* Court stated:

> [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

*Edwards*, 415 U.S. at 807. Here, LaCross explained that he searched the purse at the jail instead of at the scene of the traffic stop because "I would rather search it in a well-lit area that has a table that I can set things down on as opposed to inside of a vehicle or on the hood of a squad car." This was permissible under *Edwards* and *Rogers*. *See id.* (noting that "it is difficult to perceive what is unreasonable about the police's examining

35

and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest"); *Abel*, 362 U.S. at 239; *Curtis*, 635 F.3d at 712; *Hambrick*, 630 F.3d at 748; *Rogers*, 774 S.W.2d at 264.

For the foregoing reasons, the trial court did not err in denying Schroeder's motion to suppress the drug evidence. We overrule her third issue.

### E.      Reformation of Judgments

Schroeder's ninth through twelfth issues contend that the judgments on appeal should be reformed to correct two clerical errors: (1) the judgments both incorrectly state that she pleaded "true" to the two enhancement paragraphs, and (2) the judgments both incorrectly state that the offenses for which Schroeder was convicted are third-degree felonies.

The State concedes error. The record substantiates Schroeder's claim that she pleaded "not true" to the enhancement paragraphs; and it clearly reflects that she was charged with, tried for, and convicted of state-jail felonies, not third-degree felonies. In particular, the indictments alleged and the proof established that Schroeder used fewer than five items of identifying information, *see* TEX. PENAL CODE ANN. § 32.51(c)(1) (providing that the offense of fraudulent use or possession of identifying information is "a state jail felony if the number of items obtained, possessed, transferred, or used is less than five"), and that she possessed less than one gram of methamphetamine. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(b) (providing that the offense of possession of a Penalty Group 1 controlled substance "is a state jail felony if the amount of the controlled substance possessed is, by aggregate weight, including adulterants or dilutants, less than one gram").

We sustain the issues and modify the judgments to reflect that Schroeder pleaded "not true" to the two enhancement paragraphs in each case and that the two offenses for which she was convicted are state-jail felonies.  *See* TEX. R. APP. P. 43.2(b).

### III.  CONCLUSION

Because we have found insufficient evidence to support the jury's findings as to the enhancement paragraphs, we reverse the punishments assessed pursuant to those findings and remand to the trial court for a new punishment trial consistent with this opinion.  *See* TEX. CODE CRIM. PROC. ANN. art. 44.29(b) (West, Westlaw through 2013 3d C.S.); *Jordan v. State*, 256 S.W.3d 286, 292 (Tex. Crim. App. 2008).[25]  The judgments are in all other respects affirmed as modified herein.

> DORI CONTRERAS GARZA,
> Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of April, 2015.

---

[25] Schroeder asks, if we find the evidence to be insufficient to support enhancement, that we "remand the cause for a new punishment hearing within the proper range of punishment for a state jail felony."  We decline to provide such specific instructions, however, because it is possible that the State may produce additional evidence at the new punishment trial that would be sufficient to establish the truth of the enhancement paragraphs. *See Jordan v. State*, 256 S.W.3d 286, 292 (Tex. Crim. App. 2008) ("When a reviewing court determines that the State's evidence fails to show that an enhancement allegation is true, the Double Jeopardy Clause does not bar the use of the enhancement conviction during a retrial on punishment.") (citing *Monge v. California*, 524 U.S. 721, 734 (1998)).